## MOSELEY AUTO SALES & SERVICE AND TRI-STATE INSURANCE COMPANY v. JAMES VINES

73-53                                               497 S.W. 2d 19

Opinion delivered July 9, 1973

*Shackleford & Shackleford,* for appellants.

*Paul K. Roberts,* for appellee.

CONLEY BYRD, Justice. The issue in this Workmen's Compensation case before the Commission was whether a back injury and a 1970 operation sustained by appellee James Vines arose out of the scope and in the course of his employment or whether it arose as a result of the pulling of a lawn mower from under his house after his employment had been terminated. The Commission found that his back injury did not arise out of the scope and in the course of his employment. The circuit court reversed. The issue on this appeal by the employer Moseley Auto Sales & Service and its carrier Tri-State Insurance Company is whether there is substantial evidence to sustain the findings of fact by the Commission.

The record shows that in 1966, appellee was paid a 10% permanent partial disability for an injury to his back. In October 1968, he underwent an operation in which the 5th lumbar disc was removed. At that time he was awarded another 10% permanent partial disability to his back. In the fall of 1969 he started to work for Moseley Auto Sales & Service as a mechanic. He also helped in the body shop and did some work in the junk yard,

operated by the same employer. On December 29, 1969, appellee admittedly received an injury when he fell on the running board of a pickup truck. He was treated at that time by Dr. Merl Crow and received Workmen's Compensation benefits for one and six-sevenths (1 6/7) weeks. He returned to work on January 12, 1970, and continued to work until he was terminated February 20, 1970, because of lack of work. He did not see a doctor from the time he returned to work on January 12th until March 16th when he went to see Dr. G. F. Wynne. Thereafter, Dr. James Callaway did a laminectomy and removed the 4th lumbar disc.

Appellee describes himself as being as good as new prior to the December 29th injury. He describes the pain at that time as being in his back and left leg. At that time he was treated by Dr. Merl Crow. He states that the pain in his back got worse the two weeks that he was off and that he went back to work on January 12th because he needed the money. The pain continued thereafter, until he went to see Dr. Wynne on March 16th.

Dr. Callaway testified that when appellee visited him appellee gave a history of having been injured on December 29th with continuous sporadic pain thereafter. However, Dr. Callaway got the impression that appellee had continued to work until his pain made him unable to work. Neither did appellee tell Dr. Callaway about an incident with a lawn mower. Dr. Callaway also stated that a disc may rupture or become herniated with relatively mild traumatic experience or even with bending in an improper way. To tie a shoe could rupture a disc if it was of a predisposition to rupture. A disc deteriorates as a part of the aging process. The deterioration rate is different for different individuals. Admittedly, Dr. Callaway's sole basis for saying that the duration of pain was from December 1969 was the history obtained from appellee.

Dr. Merl Crow testified that he did not feel like appellee had a ruptured disc when he saw him the last of December 1969, and in January 1970.

Dr. G. F. Wynne testified that on March 16th appellee told him that he hurt his back pulling a lawn mower

out from under the house and the catch caught him in the back and he was having a lot of trouble. Admittedly, appellee only went to see Dr. Wynne because he could not get in to see Dr. Crow. In answer to a hypothetical question Dr. Wynne stated that he would say that the pulling of the lawn mower caused the disc syndrome.

At the first hearing before the referee Mr. Moseley testified that when Vines returned to work in January he did the same type work that he did prior to the December 29th incident and that Vines never complained about his back hurting. At that time Mr. Moseley stated that Vines' complaints about his back were not any different before December 29, 1969, and after January 12, 1970. After the circuit court had remanded the case to the commission to hear additional testimony, and Mr. Moseley had reduced his work force, his testimony became much more ameliorative toward Vines. For instance he then testified that after the December 29th injury, he cautioned Mr. Vines not to do the heavy lifting like he had done before.

In the record there is testimony that Mr. Moseley, between the layoff and March 16th, furnished a brace for Vines, but no such evidence was presented at the first hearing although both appellee and his wife testified.

Upon the record before us the issue is not where a preponderance of the evidence lies but only if there is substantial evidence to support the finding of the Commission. There is other evidence, not quoted, which tends to corroborate appellee's version  but as we view the record, whether you take the appellee's version or that of the Commission, the case boils down to an issue of credibility. The Commission had the right to believe Dr. Wynne. Consequently, we cannot say that there is no substantial evidence to sustain the finding of the Commission.

For affirmance appellee suggests that Mr. Derby, the respondent insurance company's local representative, instructed appellee to obtain medical attention. Derby not only testified that he did not recall making any such statement but showed in addition that he had no such authority. Derby was not a general agent of the carrier.

Reversed and remanded.

HARRIS, C.J., not participating.

JONES, J., dissents.

J. FRED JONES, Justice, dissenting. I do not agree with the majority opinion in this case. I do agree that the question before the Commission was whether the employee Vines sustained his ruptured disc in the course of his employment or whether it resulted from pulling a lawn mower from under his house after his employment had been terminated. I find substantial evidence that his injury arose out of and in the course of his employment, and I find no substantial evidence that it arose out of pulling a lawn mower from under his house.

Mr. Vines had previously sustained an injury resulting in the removal of the fifth lumbar disc in October, 1968. On December 29, 1969, he was working as a mechanic for the appellant and was lying on his back on the floor of a pickup truck working on wires up under the dashboard of the truck. In attempting to get out of the truck his foot slipped on the floor and he injured his back as he slid from the cab of the truck to the floor of the garage. Mr. Vines was sent immediately by his employer to Dr. Crow who testified by deposition in part as follows:

> "He was complaining of his back. He stated he was working on a pickup truck and he fell and hurt his back. That's one story he told me, and then another time he said, if I remember correctly, he was under the truck and slid out and scratched his back which caused him a lot of pain.
>
> Q. Did you find any scratches on him?
>
> A. I found some scratches, two or three scratches.
>
> Q. What did these scratches look like?
>
> A. Frankly, they resembled fingernail scratches to me.
>
> Q. Did you inquire about them?

A. No, I didn't ask him. I knew it wouldn't do any good.

Q. Did you make a diagnosis at that time?

A. My tentative diagnosis and possible diagnosis was a re-injury to an old herniated disc."

Dr. Crow testified that the old herniated disc had been removed; that he did not think he diagnosed any injury to another disc; that his diagnosis was reinjury of the old back problem. He said that he saw Mr. Vines on December 29, 30, and January 5 and 6; that he believes he released him to return to work on January 12 and has not seen him since that time.

On cross-examination Dr. Crow's attention was called to the deposition of Dr. Callaway who diagnosed a separate injury to the L-4 disc on the basis of myelograms and x-rays made after Dr. Crow's examination, and who had actually performed surgery and removed a ruptured disc from the L-4 level. Dr. Crow was asked if he would take exception to Dr. Galloway's findings and Dr. Crow said that he would. He said he did not think sliding out from under a truck would put that much force on Mr. Vines' back. Dr. Crow testified that he did not feel that Mr. Vines had a ruptured disc when he last saw him. He testified, however, that if Mr. Vines did have a ruptured disc on March 17, 1970, it is possible he could have gotten it either before or after he last saw him on January 6. He admitted that a ruptured disc is very difficult to demonstrate without x-rays, and that he made no x-rays. On Dr. Crow's medical report he submitted with his bill for services, he reported that in Mr. Vines' own words, he said he "was working in back of pickup truck and hurt his back."

Mr. Vines attempted to see Dr. Crow again on March 16, but Dr. Crow was not available so he went to see Dr. G. F. Wynne. As I view the record in this case, the Commission's denial of compensation was based primarily on what Dr. Wynne said that Vines told him on this one visit. Dr. Wynne testified that he saw Mr. Vines one time on March 16, 1970, when Mr. Vines came to him complaining of pain in his back and being unable to see his regular

physician. Dr. Wynne said he found muscle spasm in the back with pain radiating down one leg. He said Mr. Vines told him he wanted something for pain in his back and had been unable to see Dr. Crow. He said Mr. Vines told him about having surgery on his back in the past and Dr. Wynne then testified as follows:

"He said he hurt his back pulling on a lawn mower out from under the house and the catch caught him in the back and he was having a lot of trouble."

This is the only evidence I find in the entire record that Mr. Vines sustained a ruptured disc in pulling a lawn mower from under his house. This doctor was further asked and he answered:

"Q. Did he discuss in any more detail about this pulling the lawn mower out from under the house?

A. No. He just said a catch caught him in the back and that he was having a lot of pain."

Dr. Wynne testified that he based his opinion that Mr. Vines' difficulty stemmed from pulling a lawn mower on the history given him by Mr. Vines. Dr. Wynne saw Mr. Vines the one time, apparently on March 16, 1970. On April 20, 1970, he submitted standard medical report and bill forms to the employer and insurance carrier in which he makes no reference whatever to pulling a lawn mower out from under a house. He does state in this form that the date of accident was December 29, 1969. This form report over Dr. Wynne's signature calls for the following information: "State in patient's own words where and how accident occurred." This information was supplied as follows: "Laying in pickup truck and slipped out and hurt back." Furthermore in this report the following question is asked:

"Is accident above referred to the only cause of patient's condition?"

and the answer is written "Yes." There was ample space on the report for any "contributing causes," but this space was left blank and nothing about pulling a lawn mower was inserted when Dr. Wynne signed this report.

Along with this surgeon's report form was included a "surgeon's final report and bill" form also signed by Dr. Wynne in which he listed the name of the employer as James Ed Moseley, the name of the injured as Mr. James Vines, the date of injury as 12-29-69. It was stated on this form that first aid was rendered by Dr. Merle Crow; that Dr. Wynne saw Mr. Vines on March 16, 1970; that his diagnosis was "lumbo sacral back strain," and his total expenses for medical aid was $12.83.

I am totally unimpressed by Dr. Wynne's attempt to explain the glaring discrepancy in the history of the accident as he remembered Mr. Vines relating it to him, and the history as written on the medical report and bill for services. He said his nurse took the history as written on the report and it all refers to the previous injury and surgery. There was no previous injury and surgery except the one from which Vines had fully recovered before he ever went to work for Moseley. It seems obvious to me, that if Dr. Wynne only had a history that Vines injured his back while pulling a lawn mower from under a house and he rendered his diagnosis and treatment on that basis, the doctor would have rendered his report and bill for services to Mr. Vines, expecially since he does state in his surgeon's report that there had been no work for Mr. Vines on his job since February and that the patient engaged his services. I can only conclude that Dr. Wynne relied on his memory and failed to read the history of the accident his nurse took from Mr. Vines on the one trip to the doctor's office. I would certainly be unwilling to conclude that Dr. Wynne took one history for the purpose of collecting for his services from Vines' employer and another history for some other purpose. I am forced to the conclusion, however, that Dr. Wynne failed to read the medical reports when he signed them or he was confused as to what Mr. Vines did tell him.

Dr. Wynne concluded his testimony by saying that since Mr. Vines had previously had a disc removed from L-5 level, he would assume that L-4 was not damaged at that time. He said it could be assumed that either of the incidents of falling from the truck, or removing the lawn mower from under the house, could have caused the reptured disc but that in the light of the acute state of pain Mr. Vines was in on the one occasion he saw him, he

would say it was pulling the lawn mower from under the house that caused the disc syndrome.

Dr. Callaway testified that he saw Mr. Vines on March 17, 1970; that Mr. Vines told him he had been having trouble with his back off and on ever since his injury in December and had finally concluded that he was going to have to have something done for it. He testified that he removed the fifth lumbar disc back in October, 1968, and subsequently, following the injury in December, 1969, he confirmed a disc lesion at L-4 by x-ray and myelogram and removed the ruptured fourth lumbar disc. Dr. Callaway said that if Mr. Vines told him anything about an incident with a lawn mower, he made no record of it. He testified that an intervertebral disc disposed to rupture might become herniated by the relative mild experience, even with bending over to tie a shoe. Dr. Callaway testified in part as follows:

"A. He merely said he had pain in the back dating from the time of the accident, which decreased with activity [sic] and increased with activity, aggravated by bending and lifting and reduced by lying down. Sitting aggravated it. Coughing or sneezing aggravated it.

Q. This was during the entire period of December of '69, through March 17, 1970?

A. Well, except for the notable exceptions of when he took off for two weeks and was unable to work, and then worked some. Now, I'm a little confused as to his work history since you have intimated that all was not right in the relation of employee and his supervisor. I know nothing about that.

* * *

A. It's not incompatible with a history of back pain, that a person have pain, take it easy, rest, the pain will subside. He will be able to do more, and as he does more, he will aggravate his symptoms. It's a cycle thing. And, it's possible he was able to work at times and other times not with the same difficulty."

Dr. Callaway then stated:

"A. Anything is possible. We many times see patients several months after they have been injured. It's not unusual for us to see someone that's been six months since it was injured and has been treated by his private physician; and he finally decided the condition would not subside and usually sends him for treatment to us. This patient may have come directly to me since he had been here before. Also, having previous experience with back difficulty, he knows that time cures a good deal of back condition, and perhaps he decided to wait a while to find out if it would. I don't know. It's certainly possible he could have had another injury, he could have had ten."

Mr. Vines testified that he went to work for the appellant, Moseley Auto Sales & Service, in September, 1969, as a mechanic and helped with bodywork. He said he missed two weeks work when he injured his back on December 29. He said that at the time of his injury he was working on instrument lights under the dashboard of a truck and as he started to get out of the truck, his left foot slipped on the floor and he fell back across the running board of the truck. He said he experienced immediate pain in his back and left leg; that he was unable to move and that fellow-employees, Bobby Graves, Mack Anderson and his employer, Mr. Moseley, assisted him to the front of the building and Mr. Moseley directed that he be taken to Dr. Crow. He said that Bobby Graves took him to Dr. Crow; that Dr. Crow gave him a shot for pain, examined him, and gave him another shot and told him to go home. He said that the shots relieved the pain slightly and that he was taken home. He said that he returned to Dr. Crow two or three times; that his back continued to get worse but he needed to work and did go back to work after about two weeks. He said he continued on the job until the latter part of February when Mr. Moseley told him that business had become slack and that he should just take off from work for awhile and that when things picked up he would be called back. He said his back continued to hurt and seemed to continue to get worse; that he told Mr. Moseley that it looked like he was not getting any better but was getting worse. He said that while he was home his wife kept insisting that he go to a specialist but that he put off doing so in the hope that his back would get better. He said he continued to take BC powder for pain

and tablets that Dr. Crow had prescribed for him. He said he took this medication during the time he was back at work. He said that around March 16 he called for Mr. Moseley and found him out of town, so he told his secretary that he had to have something done for his back. He said he then went to Dr. Wynne who gave him a shot and a prescription for drugs. He said that the day before he went to Dr. Wynne, his wife suggested that the lawn needed mowing and as to the lawn mower incident, Mr. Vines testified as follows:

"Well, I pulled the lawn mower out from under the house, and her and my son was standing there, which she was going to mow the lawn, and I told him—I was pulling it out, and I said, 'Now, son, take it and wash it out and clean all the grass out from under it and make sure you know it is safe.'

Q. We have taken Doctor Wynne's testimony in his deposition, in which he stated that you had told him that you hurt your back or your back being hurting after pulling the lawn mower out.

A. Well, I'll say this: When I pulled the lawn mower out from under the house, I knew then that I couldn't mow it, and I went in the house and sat down. My wife come in the house and wanted to know what I was sitting down there for, and I said, 'Well, my back is hurting me,' and she said, 'Well, do you want me to go get you something.'

Q. Had your back been hurting you before you pulled the lawn mower out?

A. Yeah, real bad several times.

Q. Had you ever mowed the lawn or pulled the lawn mower around before you got hurt?

A. In twenty years of marriage, how many times—

Q. I assume quite a few times.

A. Yeah.

Q. Did that ever hurt your back?

A. No.

Q. Was your back hurting in the same place or a different place after you pulled out the lawn mower than before?

A. Well, my back and my left leg constantly hurt me from the time I fell, and it never did get better. It kept getting worse.

Q. Is that where you were hurting after pulling the lawn mower out?

A. Exactly the same way, yes, sir.

Q. Just more severe?

A. Sir?

Q. Just hurting you a little worse?

A. Well, no, sir, not no worse. I just give up then and went to the doctor.

Q. How many times did you see Doctor Wynne?

A. Once, I believe."

Mr. Vines testified that after he was seen by Dr. Wynne he next went to Dr. Callaway several times; that Dr. Callaway finally performed the operation on his back and that he was still under the care to Dr. Callaway. He said he had no trouble with his back following his previous operation in 1968 up until his injury while working for Moseley Auto Sales & Service.

Mrs. Vines corroborated Mr. Vines' testimony as to his complaints of constant pain following his injury while working for Moseley and as to the lawn mower incident, she testified as follows:

"Q. Were you present the day he pulled the mower out from under the house?

A. Yes.

Q. Did he at that time complain of any sudden pain?

A. No.

Q. To his back?

A. No.

Q. Was he hurting before he pulled it out, as far as you know?

A. Yes.

Q. What happened after he pulled it out then, as far as you know, the conversation that took place that caused him to go to the doctor?

A. Well, he said he wasn't getting any better, that he was just keeping on getting worse, and he just had to get something done, because he couldn't work the way he was hurting, and, so, I carried him to Doctor Wynne.

Q. Do you remember about how long after that he went to Doctor Callaway?

A. I believe about three days.

Q. Is it your testimony then that he didn't complain when he pulled the lawn mower out of any sharp pain?

A. No."

Mr. Vines' version of the accident on December 29, 1969, was fully corroborated by his employer Mr. Moseley and by his fellow-employees, J. D. Davis and Bobby Graves.

This case was heard three times before two Referees on remand by the circuit court and Mr. Vines testified twice. The second time he testified he was reminded of

Dr. Wynne's testimony concerning the lawn mower and he testified as follows:

"Q. . . . I want you to tell me and tell the Referee what you told Doctor Wynne concerning your activities on the day that you went to see him. Tell me the truth about that.

A. I went to see Doctor Wynne. My wife carried me up there, and Doctor Wynne asked me, said, 'James, what have you been doing today?' When I told him, you know my back was hurting me, and I told him that I had had previous back trouble and an operation, and I had re-hurt my back, and that is when he asked me, said, 'What have you been doing?' and I said, 'Nothing, laying around the house on a couch.' I said, 'Yeah, I did, I went out there and pulled a lawn mower out from under the eave of the house and was going to clean it up, and my wife was standing right there with me, and I squatted down, and I told her, I said, 'My back is hurting me so bad I just can't do nothing. I'm going to have to give up and go to the doctor anyhow,' and she said, 'Well, I've been trying to get you to for a month.'

Q. Are you telling the Referee now that this lawn mower was under the eave of the house?

A. Yes, sir.

Q. Was it just sitting there under the eave of the house?

A. Yes, sir.

Q. What did you do, did you pick it up or did you pull it out or what did you do?

A. No, I taken one hand and pulled the lawn mower out, and I had a bucket of gas there and a rag. I was going to clean it out. It had some dust and dirt sitting there all winter, and I was going to clean it up.

Q. Did you strain yourself in any way pulling this little old lawn mower out from under there?

A. No, sir.

Q. Did you hurt your back in fooling with that lawn mower?

A. No, sir.

Q. Did you pick the lawn mower up?

A. No, sir.

Q. You stooped down, you squatted down beside the lawn mower in order to take this rag and wipe off some oil or grease or something like that on it, is that what you did?

A. Yes, sir. Before I even touched the lawn mower, a week before that I'd called Mr. Moseley about my back hurting me real bad. I called out there and talked to Judy and he was in Indiana, and it was hurting me real bad then. That was before I ever even touched the lawn mower.

Q. Then you did not hurt your back with the lawn mower on the day you went to Doctor Wynne?

A. No, sir.

Q. Were you hurting all during the day of that day?

A. Yes, sir, and for several days before that.

Q. What time of day was it you pulled this lawn mower out from under there?

A. Somewhere around four o'clock.

*  *  *

Q. I want you to answer me this question now: Did you tell Doctor Wynne that you hurt your back pulling a lawn mower out from under the porch?

A. No, sir. The only time the lawn mower was mentioned to Doctor Wynne was he asked me what I

had been doing that day, and I told him I had been laying around the house there, that my back had been hurting me for a long time. and I told him, I said, 'Yeah, if you call this doing something, I pulled a lawn mower out from under the eaves of the house.''

Mrs. Vines testified again before the Referee and she again corroborated the testimony of Mr. Vines as to the lawn mower incident. Mr. Moseley again testified and again corroborated the previous testimony as to the accident and injury on December 29, 1969. At this hearing Mr. Moseley also testified that while he was out of town in the first part of March, about a week after he had laid Mr. Vines off for lack of work, that Vines called and requested an advancement for the purchase of a back brace, and that Vines received the money for that item. He said that he had a conversation with Mr. Vines about two weeks or 20 days after he was laid off, at which time Mr. Vines told him he was needing some attention and needed to be hospitalized for a specialists to check his back. He again said that when he met his compensation insurance agent Mr. Derby in the Warren Bank, Mr. Derby told him to advise Vines to go ahead to the hospital and get a specialist and that Mr. Derby would start the paper work on the matter. He said that Mr. Derby just said to go ahead and get medical attention. He said that he then relayed this information to Vines and that Vines then went to see Dr. Callaway who performed his operation.

At the final hearing before the Referee Mrs. Judy Moseley the wife of the employer, also testified. She said she worked in the office for Mr. Moseley at the time Mr. Vines sustained his back injury; that she had charge of the payroll and was working in the office after Mr. Vines came back to work following his injury. She said that approximately the first week in March Mr. Vines called her by phone and requested money for a back brace. She said that Mr. Moseley was out of town and that she advised Vines to come to the office and that she gave him the money he requested from the cash register. She then testified as follows:

"Q. Do you recall you or your husband either one buying Vines any medicine or paying for pain pills?

A. Yes, sir.

Q. Tell about that, please.

A. I don't know if the medicine was called in or if he went to the doctor. All I recall is we got a bill for it, and we did pay for the medicine, the prescription.

Q. Paid that from your own personal funds?

A. Yes, sir.

Q. Did you have any conversation with Mr. Vines concerning him having to go to the hospital?

A. Well, yes, I have talked to James on the phone and maybe—I say 'maybe' he did come out once when James Ed was gone and talked about his back, that he had to have some help as far as some hospitalization or a doctor, I did.

Q. That was after the layoff, wasn't it?

A. Yes, sir.

Q. And did James tell you he had to go into the hospital?

A. Said he needed to."

On cross-examination Mrs. Moseley testified that she does the bookkeeping in the office for her husband.

The first hearing in this case was conducted on June 19, 1970, before Referee McClendon who denied the claim. No additional evidence was heard by the full Commission on review and the full Commission also denied the claim. On appeal to the circuit court the case was remanded to the Compensation Commission for rehearing. The Compensation Commission referred the case to Referee Robert J. Donovan for additional hearing but limited the hearing to the testimony of fellow-employees J. D. Davis and Bobby Graves. The Referee again denied compensation and the Commission again also denied compensation.

The case was again remanded to the Commission by the circuit court for rehearing with a holding that the Commission had erred in limiting the testimony to that of Davis and Graves. The case was again referred to Referee McClendon at which time Mr. and Mrs. Vines and Mr. and Mrs. Moseley testified as above set out. The Referee again denied the claim as did the full Commission on the record. The Commission concluded its opinion on this occasion as follows:

> "After careful review of the entire record . . . the Commission further finds that the additional testimony presented by claimant has failed, in light of prior evidence, to negate the occurrence of injury subsequent to claimant's employment with respondent-employer, Moseley Auto Sales and Service."

Upon appeal to the circuit court, the court found that there was no substantial evidence to warrant the Commission's denial of compensation benefits to Mr. Vines and the decision of the Commission was reversed and the case was remanded with instructions to the Commission to award compensation benefits as provided by law.

I agree with the trial court that there is no substantial evidence under which the Commission denied compensation benefits to Mr. Vines in this case. It is my view that if the evidence we have in this case constitutes *substantial evidence,* to sustain the Commission, this court is working the "substantial evidence rule" overtime. Under such evidence this court would be required to sustain the denial of award for compensation for a ruptured disc sustained in any kind of accidental injury where the employee suffered constant but recurring episodes of excruciating pain, the last of which occurred when he stoops or squats down to service a lawn mower or bends over to tie a shoe. I also note that no member of the Commission ever saw Vines or any of the witnesses in this case in so far as the record discloses. It rendered its decision on the record of evidence taken at different times before two separate Referees.

I would affirm the trial judge in this case.